IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JOSHUA DAVID CLARKE,<br><br>Defendant. | No. CR12-0043<br><br>REPORT AND<br>RECOMMENDATION |

TABLE OF CONTENTS

*I.*    *INTRODUCTION* ................................. 1

*II.*   *PROCEDURAL HISTORY* ........................... 2

*III.*  *RELEVANT FACTS* ................................ 2

*IV.*  *DISCUSSION* .................................... 4
     *A.*   *Alleged Fourth Amendment Violation* ............... 4
     *B.*   *Alleged Fifth Amendment Violation* ................ 7
          *1.*   *Was the Waiver Knowing and Intelligent?* .......... 8
          *2.*   *Was the Waiver Voluntary?* .................... 9

*V.*   *RECOMMENDATION* .............................. 10

*I. INTRODUCTION*

On the 13th day of August 2012, this matter came on for hearing on the Motion to Suppress Evidence (docket number 19) filed by the Defendant on August 1, 2012, and the Resistance (docket number 21) filed by the Government on August 6, 2012. The Government was represented by Special Assistant United States Attorney Lisa C.

Williams. Defendant Joshua Clarke appeared personally and was represented by his attorney, David Nadler.

## II. PROCEDURAL HISTORY

On June 5, 2012, Defendant Joshua David Clarke was charged in an indictment with being a felon in possession of a firearm (Count 1) and possession of a stolen firearm (Count 2). At his arraignment, Defendant entered a plea of not guilty and trial was scheduled before Chief Judge Linda R. Reade on September 10, 2012.

On August 1, 2012, Defendant timely filed the instant motion to suppress. Because of the pending motion, the trial was continued to October 9, 2012.

## III. RELEVANT FACTS

On March 31, 2012, Officers Christopher Christy and Mitch Magill were on routine patrol in downtown Cedar Rapids. The officers were dispatched to the Tycoon Bar following a report of a man with a gun inside the bar. Upon arrival at the bar, the officers spoke with security personnel at the door. The "bouncer" pointed out Defendant, who was sitting at the bar, and told the officers that when Defendant first attempted to enter the bar he was "wanded" and found with a gun. The bouncer told Defendant to take the gun out to his car, and the bouncer told officers that everything was "fine." Officer Christy testified, however, that the bar was "not the friendliest" toward law enforcement and the bouncers "aren't always cooperative." Christy wasn't sure if the bouncer was being truthful. Officer Magill also testified that he was not convinced the matter was "completely resolved."

While speaking with the bar's security personnel, both officers continued to watch Defendant. Officer Magill opined at the hearing that Defendant appeared to be "staring at us." As the officers started walking toward Defendant, he stood up and "took off" at a "fast paced walk" toward the bathroom. According to Officer Christy, it seemed like Defendant was "trying to get away from me." The officers also picked up their pace and entered the bathroom just a few seconds after Defendant.

As Officer Christy entered the bathroom, he yelled "stop, police." Christy found Defendant in one of the two stalls, with the door partially open. Christy, who had his weapon drawn, could see Defendant with a gun in his hand. The lid of the toilet was "somewhat removed" and it appeared to Christy that Defendant intended to hide the gun in the toilet. Christy put his gun up to Defendant's chest and told him to drop his weapon. According to Christy, Defendant appeared "scared" and didn't move. Christy then reached down and removed the gun from Defendant's hand. At that time, Officer Magill took Defendant to the ground and placed him in handcuffs.

While the record is somewhat imprecise regarding the timing, three additional officers arrived on the scene. Officer Magill then took Defendant outside and placed him in the backseat of a squad car. At some point, Officer Christy walked out to the squad car, opened the door, and read Defendant his *Miranda* rights. Defendant was asked if he understood his rights and he said "yes." When asked "will you talk to me," Defendant said "yes." According to Christy, Defendant was "out of breath and kind of in shock" from the dramatic events in the bathroom. Christy opined that Defendant was "coming down" from the "scary moment." Defendant, who was on probation following a deferred judgment for burglary in the third degree, then made incriminating statements regarding his acquisition and possession of the firearm.

Officer Christy cited Defendant for public intoxication, in violation of Iowa Code section 123.46. (It was not learned until later that Defendant was prohibited from possessing a firearm.) Christy testified at the hearing that Defendant was "drunk" and "had too much to drink." According to Christy, Defendant had an odor of alcohol coming from his mouth and "somewhat slurred speech." Christy testified, however, that he could understand what Defendant was saying and "his words weren't garbled or anything like that." It was not necessary for Christy to repeat himself, Defendant maintained eye contact, and, according to Christy, "the conversation made sense."

3

During his testimony, Officer Magill added that Defendant had bloodshot and watery eyes, but did not exhibit any problems with balance. As they followed Defendant toward the bathroom in the bar, neither officer observed Defendant having any difficulty walking. Similarly, when Magill escorted him out to the squad car, Defendant did not stumble or need any assistance in walking. Both officers opined that Defendant's intoxication did not affect his ability to understand and waive his *Miranda* rights. The officers did not administer a field sobriety test and Defendant declined an intoxilyzer examination upon arrival at the jail.

## IV. DISCUSSION

In his motion to suppress, Defendant first argues the officers did not have reasonable suspicion to conduct an "investigatory stop" and, therefore, violated the Fourth Amendment. Next, Defendant argues that he "did not waive his right against self-incrimination," and his in-custody statements were made in violation of the Fifth Amendment.

### A. Alleged Fourth Amendment Violation

Defendant argues the officers did not have reasonable suspicion to conduct an investigatory stop of Defendant. Neither Defendant's motion nor his brief identify specifically when the allegedly unconstitutional action occurred. At the time of hearing, however, Defendant's counsel conceded that the officers did not violate Defendant's constitutional rights by entering the bar, talking to security personnel, or walking toward the area where Defendant was seated. In addition, there is no constitutional prohibition to officers entering a bathroom in a bar. Defendant argues, however, that when the officers yelled "stop, police" upon entering the bathroom, a seizure occurred.

The Government seems to concede that a "seizure" occurred for Fourth Amendment purposes when Officer Christy, with his weapon drawn, yelled at Defendant to stop, and, seconds later, placed his gun at Defendant's chest. The Government argues, however, that

the seizure was supported by a reasonable and articulable suspicion that Defendant may have committed a crime and, therefore, was not violative of the Fourth Amendment.

I first turn to the familiar case of *Terry v. Ohio*, 392 U.S. 1 (1968). There, John Terry appealed his conviction for carrying a concealed weapon. Terry argued that the Fourth Amendment was violated when he was approached in public by a police officer and, without probable cause, patted down for a weapon. The Supreme Court affirmed the conviction, concluding that an intervention is not violative of the Fourth Amendment if the facts available to the officer would "'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *Id.* at 22 (quoting *Carroll v. United States*, 267 U.S. 132 (1925)). Specifically, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21.

"While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). "The officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." *Id.* at 123-24 (citing *Terry* at 27). "Whether such suspicions are reasonable is assessed from the point of view of trained law enforcement officers based on the totality of the circumstances known to the officers at the relevant time." *United States v. Zamora-Lopez*, 685 F.3d 787, 790 (8th Cir. 2012).

Turning to the facts in the instant action, the officers were dispatched to the bar following a call reporting a man inside the bar with a gun. Upon arrival at the bar, the officers were told by security personnel that Defendant was found earlier with a gun, but was instructed to take it to his car. The officers were suspicious of the bouncer's statements, however, and decided to investigate further. (Even *if* the bouncer was being truthful, there is no indication whether Defendant complied with the bouncer's instructions,

or if he was checked again upon his return to the bar.) As the officers started walking toward the area where he was seated, Defendant – who had been "staring" at the officers – got up and started walking toward the bathroom at a fast pace. The Supreme Court has recognized that "evasive behavior is a pertinent factor in determining reasonable suspicion." *Wardlow*, 528 U.S. at 124.

Officers Christy and Magill were not acting on some "unparticularized suspicion or hunch." Rather, they were called to the bar following a report of a man with a gun. Upon arriving, bar security personnel confirmed that Defendant – who matched the description of the person identified in the earlier phone call – had been found earlier with a gun. The officers were unsure whether Defendant had taken the gun to his car, as allegedly instructed, and decided to investigate further. Defendant concedes that there is no constitutional prohibition against approaching an individual and speaking with him, if he is willing to do so. *United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008) ("a consensual encounter between an officer and a private citizen does not raise Fourth Amendment concerns.") (citing *Florida v. Rodriguez*, 469 U.S. 1, 5-6 (1984)). Accordingly, the officers were free to approach Defendant to see if he would respond to questions.

Before the officers could reach Defendant's location, he "took off" at a "fast paced walk" toward the bathroom. I believe the totality of the circumstances, including Defendant's apparent effort to evade the officers, would support a "reasonable suspicion" that criminal activity was afoot. "[T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 125. Defendant's argument that people in bars routinely use the bathroom and that possession of a firearm may not be unlawful, is unavailing. "The behavior on which reasonable suspicion is grounded need not establish that the suspect is probably guilty of a crime or eliminate innocent interpretations of the circumstances." *United States v. Stewart*, 631 F.3d 453, 457 (8th Cir. 2011) (quoting *United States v. Carpenter*, 462 F.3d

981, 986 (8th Cir. 2006)). "Thus, factors that individually may be consistent with innocent behavior, when taken together, can give rise to reasonable suspicion, even though some persons exhibiting those factors will be innocent." *Id.*

There is some question here regarding whether Defendant was "seized" when Officer Christy entered the bathroom and yelled "stop, police," or when – seconds later – Christy encountered Defendant in the bathroom stall holding a gun. Because I believe that reasonable suspicion existed for the investigatory stop before the officers entered the bathroom, the fine distinction regarding precisely when Defendant was seized need not be determined by the Court. I do not believe the actions of the officers violated Defendant's Fourth Amendment rights.

### B. *Alleged Fifth Amendment Violation*

Next, Defendant argues that he "did not waive his right against self-incrimination," and his incriminating statements were made in violation of the Fifth Amendment. It is undisputed that Defendant was in custody when questioned by Officer Christy in the back of the squad car. Defendant concedes that he was advised of his *Miranda* rights, as required. While Defendant argues that he "did not waive his right against self-incrimination," Christy testified that when asked "will you talk to me," Defendant said "yes." Accordingly, the Court finds Defendant expressly waived his *Miranda* rights. At the least, it is undisputed that Defendant responded to Christy's questions, thereby impliedly waiving his *Miranda* rights. *See Thai v. Mapes*, 412 F.3d 970, 977 (8th Cir. 2005) (noting the Supreme Court has recognized an implied waiver of *Miranda* rights) (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).

Instead, Defendant's actual argument appears to be that his waiver of the *Miranda* rights was not knowing and voluntary. "A waiver is 'knowing and intelligent" where it is made with full awareness of both the nature of the right being abandoned and the consequences of abandoning the right, and a waiver is 'voluntary' where the court can determine that the waiver was a product of the suspect's free and deliberate choice, and

7

not the product of intimidation, coercion, or deception." *Thai*, 412 F.3d at 977 (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). That is, the inquiry regarding whether a suspect has effectively waived his *Miranda* rights has "two distinct dimensions":

> First, the waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Second, the suspect must have waived his rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

*United States v. Vinton*, 631 F.3d 476, 483 (8th Cir. 2011) (quoting *Moran*, 475 U.S. at 421). In determining whether a suspect's waiver is valid, the court must consider the totality of the circumstances. *Id.*

### 1. Was the Waiver Knowing and Intelligent?

The Court will first determine whether Defendant's waiver of his *Miranda* rights was "knowing and intelligent." While neither his motion nor his brief are precise in this regard, Defendant apparently relies on his alleged intoxication to support his argument that the waiver of his *Miranda* rights was not "knowing." Defendant notes that he was cited for public intoxication at the time of the incident, and the officers testified he had an odor of alcohol coming from his mouth, his speech was "somewhat slurred," and his eyes were bloodshot and watery. Officer Christy testified at the instant hearing that Defendant was "intoxicated" and "drunk." The Government argues, however, that there are varying degrees of intoxication. Christy testified that during the interrogation, Defendant maintained eye contact, it was not necessary for Christy to repeat himself, Defendant's words were not "garbled or anything like that," and "the conversation made sense." Both officers testified that Defendant had no difficulty with balance or walking, either inside the bar when attempting to evade the officers, or after his apprehension when being led to the squad car.

In his brief, Defendant cites *United States v. Turner*, 157 F.3d 552 (8th Cir. 1998), for the proposition that "[i]ntoxication may belie a knowing and intelligent *Miranda*

waiver."[1] Turner argued that the waiver of his *Miranda* rights "was not knowing and intelligent because he was impaired by a low IQ, PCP intoxication, and mental illness." *Id.* at 555. The Court rejected Turner's argument, noting that although he later exhibited "bizarre" behavior, at the time of his confession he was cooperative and responsive to questions. The Court noted that it had previously declined to adopt a *per se* rule when confronted with intoxication, citing *United States v. Makes Room*, 49 F.3d 410, 415 (8th Cir. 1995) ("We have repeatedly declined to adopt a per se rule of involuntariness when confronted with intoxication and/or fatigue, and we decline to do so now.").

While Defendant showed some signs of intoxication ("somewhat slurred speech"), the totality of the circumstances supports a finding that Defendant understood the *Miranda* warnings when he agreed to speak with Officer Christy. According to Christy, Defendant understood the questions and answered responsively. It was not necessary for Christy to repeat himself, Defendant's answers were not "garbled," and, according to Christy, "the conversation made sense." This testimony is consistent with the observation of the officers that Defendant did not show any difficulty with balance or walking either inside of the bar or while being escorted to the squad car. The fact that Defendant had "an odor of alcohol coming from his mouth" is hardly surprising and, standing alone, does not establish that Defendant's waiver of his *Miranda* rights was unknowing.

### 2. *Was the Waiver Voluntary?*

Next, the Court must consider whether Defendant's waiver of his *Miranda* rights was voluntary, and not the product of "intimidation, coercion, or deception." Again, Defendant's motion and brief are not terribly helpful in this regard. Defendant asserts in his brief that he was "intimidated," but does not detail his argument in that regard. Defendant apparently relies on the dramatic events in the bathroom, however, and Officer Christy's testimony that he was "out of breath and kind of in shock" when being questioned in the back of the squad car. The Government apparently concedes that having

---

[1] Defendant's Brief (docket number 19-1) at 4.

a gun placed to one's chest is a frightening experience. The Government argues, however, that there is no evidence Defendant's statements made at a later time in the squad car were involuntary.

The test for voluntariness is "whether the defendant's will has been overborne." *United States v. Syslo*, 303 F.3d 860, 866 (8th Cir. 2002). Here, the questioning was limited – lasting approximately five minutes – and there is no evidence that Officer Christy raised his voice or was otherwise threatening or coercive at that time. There was no allegation that Christy deceived Defendant in eliciting responses to his questions. Defendant is apparently of at least average intelligence and has had prior dealings with law enforcement officers. While the evidence supports a finding that Defendant was "coming down" from the admittedly dramatic events inside the bar's bathroom, the Court does not believe that the earlier events rendered involuntary the statements made later in the squad car. Furthermore, Defendant's intoxication does not render his statements involuntary, unless his will was overborne. *United States v. Howard*, 532 F.3d 755, 763 (8th Cir. 2008). The Court cannot make that finding on this record.

In summary, I believe Defendant's waiver of his *Miranda* rights was knowing, intelligent, and voluntary. Accordingly, I find no Fifth Amendment violation.

## V. RECOMMENDATION

For the reasons set forth above, it is respectfully **RECOMMENDED** that the Motion to Suppress Evidence (docket number 19) filed by the Defendant be **DENIED**.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report*

*and Recommendation, they must promptly order a transcript of the hearing held on August 13, 2012.*

DATED this 20th day of August, 2012.

_____
JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA